## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

**OTIS OLIVER MCCRAY**                                                                              **PLAINTIFF**

**v.**                                                                              **No. 3:15CV154-MPM-RP**

**MDOC, ET AL.**                                                                                 **DEFENDANTS**

### MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Otis Oliver McCray, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff alleges that the defendants violated the Eighth Amendment prohibition against cruel and unusual punishment by failing to provide him with adequate medical care. The defendants have moved [79] for summary judgment; the plaintiff has responded to the motion, and the defendants have replied. The matter is ripe for resolution. For the reasons set forth below, the motion [79] by the defendants for summary judgment will be **GRANTED**, and judgment will be entered for the defendants.

### Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not

"assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings. Rather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id*. The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 871-73, 110 S.Ct. 3177, 3180 (1990), "unsubstantiated assertions," *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994). It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."

In considering a motion for summary judgment, once the court "has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, [the ultimate decision becomes] purely a question of law." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

## The Plaintiff Has Altered Documents Before
## Submitting Them to the Court

Before setting forth the undisputed facts, the court must note that Mr. McCray has altered some of the documents he has presented to the court. There are instances where the date or content of the plaintiff's copy of a document differs from that found in the certified copy. Though the plaintiff alleges that the defendants have altered the dates and, perhaps, the content of some documents, the nature of the changes make clear that the plaintiff, himself, altered the documents in his possession before submitting them to the court. The plaintiff clearly gained possession of an incomplete document, then filled in the blank spaces with statements more favorable to his positions in this case.

An example of this deception can be found when comparing the certified copy of the First Step Response Form to Grievance Number MCCF-15-315 (an exhibit to the defendants' motion for summary judgment [Doc. 90-2 at 18]) with the version attached to McCray's Response to that motion [Doc. 86 at 39]. One of McCray's claims in this case is that he did not receive a medication prescribed by a doctor to treat prostate trouble.

## The Certified First Step Response

In the *certified* document, Nurse Darnell states:

You were seen by the specialist on 6/11/15 and the medication the specialist ordered was KOP'd to you on 6/16/15.

The term KOP means "keep on person;" thus, medical personnel simply handed the medication to him so that he could take it when needed, rather than waiting for the nurse to come by his cell several times per day to dispense it. In response, Mr. McCray acknowledges that he received the medication, but only after he told the doctor that the prescription was not initially in the computer:

Nurse Gale & crew did not put the presribtion in the computer, after I came from the uroxlist, 3 months later when the sick call I place, to c the doctor that's when it happen.

Check ur constulation report, the medication was not in the computer 7-15-15. If I had

not toll the doctor on the 7-15-15; it would have been 3 months late.

Doc. 90-2 at 18 (errors in original). On the next page is a document showing that Mr. McCray received the medication on June 16, 2015. He complains in that document that he got the medication only after the consult:

> This was after; the constulation. Report will show the misconduct. Ask the Doctor what happen!! (unless the dates was change) U know Birds of a Feather Flock Together

*Id*. (errors in original). In the next line he threatens to alter medical documents in the future:

> I'm change some dates to c what happen; Imagine THAT!!

*Id.* McCray signed the certified copy and wrote the date: "Oct 7 2015."

## Uncertified Document

Parts of the *uncertified* First Step Response Form No. MCCF-15-315 are identical to the certified version – the parts filled in by medical personnel. It is Mr. McCray's responses that differ. The plaintiff's statements in the *uncertified* copy attached to his response are seemingly unrelated to those in the uncertified copy:

> Darnell change date of complaint.
>
> What happen to the remedy, for Nurse Gale, Nurse Mayson, Nurse Jackson, and Dental Clerk Burch, Not satisfied with this Adminstrative Remedy Program at (MCCF) \*\*

Doc. 86 at 39 (errors in original). Also, in the uncertified document, McCray did not sign or date his reply to the First Step Response. The Second Step Response, drafted by Dr. Kpabitey, was identical in both versions:

> You were seen by the Urologist and he ordered a medication that is not on the Centurion formulary. These medications have to be first viewed by the Medical Director and a request for approval of the medication must be sent to the appropriate people for review and approval. Due to the process, these specialty medications cannot be available immediately. I will do all I can on my part to expedite this process and ensure that my clients receive their medication as quickly as possible.

Doc. 90-2 at 43. Dr. Kpabitey signed the document on December 7, 2015; Mr. McCray on December 21, 2015.

## Parts of Another Document Obliterated

As another example, in an uncertified Second Step Response Form (Doc. 86 at 42), Mr. McCray has obliterated the grievance number, leaving only the "MCCF" portion, a designation for the Marshall County Correctional Facility. The court can tell the grievance number was obliterated because: (1) that number (MCCF-15-02) can be found on the certified copy of the form, Doc. 90-2 at 7; and (2) though most of the text present on the certified form is missing on McCray's copy, a small part on his copy trailed up into the line above, between the words "Remedy" and "Program." Thus, the text clearly existed on an original copy, and was partially obliterated on Mr. McCray's copy. It appears that Mr. McCray has tried to match up MDOC responses to one grievance with a separate, unrelated grievance. There is no valid reason for doing this.[1]

## McCray's Past Presentation of Misleading Documents

Indeed, Mr. McCray has a history of presenting false or misleading documents to courts. When pursuing post-conviction collateral relief in the Mississippi Court of Appeals, he argued that his indictment was defective because it was signed only by the District Attorney. In support of his argument, he presented a copy of his indictment that only the prosecutor had signed. The Mississippi Court of Appeals reviewed this claim – first, holding that it was procedurally barred, then reviewing the merits of the claim:

McCray contends that his indictment was defective because it was not signed by either

---

[1] The court has reviewed Mr. McCray's extensive medical record and notes that doctors have prescribed him a variety of psychotropic medications to treat mental illness. For the present, the court will attribute McCray's alterations of documents as a manifestation of mental illness – and will not issue a show-cause order regarding the propriety of sanctions for attempting to mislead the court. However, if in the future the court discovers alterations of documents in this case or others, such a show-cause order will issue

the foreman of the grand jury or the circuit clerk. McCray attached a copy of his indictment, signed by the district attorney only, to his brief on appeal.

. . .

[W]e find no merit to McCray's [defective indictment] claim. The only support he offers is a copy of the indictment that has been attached to his brief on appeal. In reviewing this case we are limited to the appellate record, and a party cannot make something part of the record by simply binding it with his brief. *McCullough v. State,* 47 So.3d 1206, 1211 (¶ 18) (Miss.Ct.App.2010). *McCray also ignores the certified copy of his indictment, found on the first page of the record, that is both signed by the grand jury foreman and stamped filed in the circuit court.* The fact that an unsigned copy of the indictment exists somewhere has no effect on the fully executed indictment in the record.

*McCray v. State*, 107 So. 3d 1042, 1044–45 (Miss. Ct. App. 2012) (emphasis added).

### The Court Will Not Consider the Documents Submitted by the Plaintiff

As Mr. McCray has obviously altered the documents he submitted in response to the defendants' motion for summary judgment, the court will not consider them in the instant memorandum opinion.

### Undisputed Material Facts

The facts set forth below are either admitted by the plaintiff or may be found in the relevant medical and dental records. On September 8, 2015, Otis Oliver McCray ("McCray"), a *pro se* litigant currently incarcerated at the Marshall County Correctional Facility ("MCCF") for receiving stolen property, robbery, and manslaughter, filed a complaint under 42 U.S.C. § 1983. Doc. 1. McCray's complaint alleges that, while incarcerated at MCCF, defendants Gale, Mason, and Jackson, for two months, withheld medication prescribed to him by a "free-world" physician. McCray contends that, as a result, the defendants were deliberately indifferent to his medical needs relating to prostate cancer. *Id.* McCray's medical records show that he suffers from chronic prostate pain; however, no diagnosis of prostate cancer appears in his medical record.

McCray's medical records, however, reflect that he received all medications prescribed to him, including Flomax, during the relevant time period of June to August 2015. On June 12, 2015, McCray was seen and evaluated by Dr. Stallworth, a physician at MCCF. *See* Medical Records attached to the defendants' motion for summary judgment as Exhibit A at 4-5. The same day, McCray was transported from MCCF for an off-site trip to a urology appointment. *Id.* at 6. The urology report completed at that time noted that McCray probably had a prostate infection. *Id.* at 5. The urologist prescribed Flomax and requested that McCray return for a follow-up visit in one month. *Id.* Gale updated McCray's medical records upon his return from the urology appointment, including documenting McCray's prescription for Flomax with instructions for McCray to take one capsule by mouth daily. *Id.* at 7. McCray's medical chart shows that the medications prescribed to McCray at that time included Flomax. *Id.* at 19. Defendant Gale also documented that McCray was to have a follow-up appointment with the urologist in one month. *Id.* at 7.

Following his off-site urology appointment, McCray submitted several sick-call requests during the relevant time period. None of these sick call requests included the complaints that the defendants withheld prescription medication following McCray's June urology appointment. For example:

- June 13, 2015 Sick-Call Request: McCray submitted a sick-call request due for symptoms of head congestion, nasal and ear drainage, and a cough. *Id.* at 9, 11. He was evaluated by medical staff the same day. *Id.*

- June 24, 2015 Sick-Call Request: McCray submitted another sick-call requesting to see a doctor and have his medications refilled. *Id.* at 14. He was evaluated by medical staff on June 27, 2015 at which time he requested a renewal of his Neurontin for his back pain. *Id.* at 15.

- July 2, 2015 Sick-Call Request: McCray submitted a sick-call requesting to see a doctor for his back pain and medication refill. *Id.* at 22. On July 3, 2015, McCray was advised he had an appointment scheduled with a doctor in response to his sick call. *Id.* at 22-23.

- July 4, 2015 Sick-Call Request: McCray submitted another sick-call requesting medication refill for his back pain. *Id.* at 25. McCray was evaluated by medical staff on July 5, 2015 for complaints of cold and sinuses and for his request medication refill for his back pain. *Id.* at

26. The medical provider prescribed medication for his cough advised McCray that he has a scheduled appointment with a doctor for his back pain. *Id.* McCray was evaluated by Dr. Kpabitey on July 10, 2015 in response to his sick-calls relating to his back pain and request for medication refills for Neurontin, Flexeril and psych medications. *Id.* at 29. Dr. Kpabitey renewed his prescription for Neurontin and prescribed him an antibiotic shot. *Id.* at 29-31. Defendant Jackson updated his medications per Dr. Kpabitey's orders the same day. *Id.* at 32.

► July 12, 2015 Sick-Call Request: McCray submitted a sick-call request seeking psychological treatment stating that he was hearing chains falling and requested a medication refill. *Id.* at 34. McCray was evaluated by mental health providers on July 14, 2015. *Id.* at 46-48.

On July 13, 2015, McCray was seen by the off-site urologist for his one-month follow-up visit. *Id.* at 36, 38-41. The urologist noted that McCray's "chief complaint" was that McCray did not believe that the Flomax trial was helping his symptoms. *Id.* at 38-39. The urologist then prescribed Uroxatral to McCray. *Id.* at 40. Upon his return to MCCF, McCray advised medical staff that he was prescribed a new medication. *Id.* at 44. Uroxatral was added to McCray's medication list and a one-month follow-up was scheduled if his symptoms did not improve. *Id.* On August 12, 2015, McCray was seen by Dr. Kpabitey, a doctor at MCCF, for a sick-call request for pain medication renewal and a urology follow-up. *Id.* at 60. Dr. Kpabitey added new medications for McCray's symptoms. *Id.*; *see also* Doc. 18 at 2.

McCray was seen by Dr. Kpabitey again on October 13, 2015 for complaints of difficulty passing urine and because he had finished the medication prescribed by the urologist. *Id.* at 119. Because his symptoms had not subsided, Dr. Kpabitey requested a urology follow-up appointment for McCray on October 14, 2015. *Id.* at 122.

McCray submitted another sick-call request on November 11, 2015, complaining of prostate pain. *Id.* at 143. He was evaluated by defendant Gale on the same day, who advised him that Dr. Kpabitey had already requested a urology appointment for his chronic prostate pain. *Id.* at 145. McCray was seen by the outside urologist again on November 20, 2015. *Id.* at 156. McCray was continued on the Uroxatral medication. *Id.* at 157. Dr. Kpabitey requested the prescribed Uroxatral as

a non-formulary medication request. *Id.* at 164. The medical records note that this medication had to be approved on instructions of a specialist on December 1, 2015. *Id.* at 166.

On September 1, 2016, Plaintiff was seen by a different "free-world" urologist, who scheduled an operative procedure cystoscopy for Thursday, September 8, 2016. *Id.* at 359, 362. Between September 1 and September 8, McCray continued to have prostate problems and was granted a "lay-in" related to those problems. *Id.* at 372-391. Medical staff performed various evaluations and tests on McCray relating to his complaints of prostate pain in September 2016. *Id.* McCray underwent surgery off-site on September 8, 2016, to treat his prostate condition. *Id.* at 394-95.

Upon returning to MCCF, he received his first dose of the medications ordered by the urologist. *Id.* at 420. He was seen by the off-site urologist for additional procedures and follow-ups on September 13, 2016, and September 20, 2016. *Id.* at 438, 447. The offsite urologist recommended follow-up in one-year. *Id.* at 447.

**Plaintiff's Alleged Denial of Dental Care**

With respect to his dental care, McCray has continuously been evaluated and treated by medical staff and dentists during his incarceration. Defendant Burch is a dental assistant. McCray submitted a sick-call request on September 21, 2015 requesting to see a dentist regarding tooth pain. *Id.* at 80. He was seen by a registered nurse the next day. *Id.* at 81. The nurse indicated that McCray's left front tooth was broken almost in half and referred him to the first available dental appointment. *Id.* McCray submitted another sick-call request on September 26, 2015 again complaining of tooth pain and requesting that his denture plate be refitted. *Id.* at 89. McCray was seen by a registered nurse the next day, who noted that he had a dental appointment scheduled. *Id.* at 90-91. McCray was seen by a dentist on September 30, 2015. *Id.* at 98. McCray executed an oral surgery treatment consent form and had dental surgery to extract his tooth. *Id.* at 97-98; 104-07.

About a week later, McCray was seen by a registered nurse on October 8, 2015, with continued complaints of tooth problems. *Id.* at 115. He was referred to the dentist again. *Id.* He was triaged again on October 18 regarding his request for a tooth to be added to an existing partial plate (a partial denture consisting of a replacement tooth attached to a gum-colored base). *Id.* at 126. McCray was told he had a dentist appointment scheduled. *Id.* McCray had a consultation for a repair of his partial plate on February 20, 2016. *Id.* at 240. The dentist noted that McCray had an existing partial, but had lost an abutment tooth. *Id.* The dentist recommended McCray receive a new partial, or tooth and clasp to be added to the existing partial. *Id.* McCray requested a follow-up dental consultation on February 26, 2016, and he was referred to dental by medical staff. *Id.* at 246.

On March 30, 2016, McCray executed a consent for dental treatment. *Id.* at 292-93. The treating dentist made impressions of McCray's teeth, smoothed a sharp edge on one of his teeth, and put in an order for the repair of McCray's partial. *Id.* at 295-96. McCray was provided with his repaired partial on April 6, 2016. *Id.* at 310.

McCray was seen by a different dentist on April 30, 2016 for his regular two-year dental visit. *Id.* at 316. No follow-up or additional work was noted relating to McCray's dental care at this time. *Id.*

McCray submitted a sick-call request for another broken tooth on July 25, 2016. *Id.* at 319. He was seen by registered nurse on July 26 and referred to the dentist. *Id.* In August, McCray submitted another request to be seen by a dentist. *Id.* at 367. McCray was treated by a dentist on September 2, 2016. *Id.* at 371; 374. The dentist noted that if his tooth remained symptomatic, he should return for extraction. *Id.* at 374. McCray requested his tooth to be extracted on September 21, 2016. *Id.* at 453. He was treated by a dentist on September 23, 2016. *Id.* at 454.

### McCray's Grievance File.

McCray submitted a grievance relating to his urology medication in August 2015. *See* Grievance Records attached to Defendants' Motion as Exhibit B at 13. McCray's request was returned to him because it was unsigned and did not specify any relief sought. *Id.* McCray then received his first-step response on October 5, 2015, which stated that the medication prescribed by the specialist on June 11, 2015 (the Flomax) was ordered and "KOP'd" to him on June 16, 2015—i.e., delivered to him "keep on person" – in sufficient quantity that he could self-administer the Flomax for a certain period of time. *Id.* at 14. McCray responded that he did not receive his medication until three months later. *Id.* at 18. McCray's second-step response from Dr. Kpabitey advised him that the new medication ordered by the specialist on November 20, 2015, was not on the Centurion formulary so it had to be reviewed and approved before it could be given to him. *Id.* at 20.

McCray never submitted a grievance through the ARP program regarding his complaints about dental care. *See id.*

### Exhaustion of Administrative Remedies

Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* – including its requirement that inmates exhaust their administrative remedies prior to filing suit – in an effort to address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress meant for the exhaustion requirement to be an effective tool to help weed out the frivolous claims from the colorable ones:

> Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts. *Woodford v. Ngo*, 548 U.S. 81, 94, n. 4, 126 S.Ct. 2378 (2006) (slip op., at 12, n.4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of non-meritorious claims does not submerge and effectively preclude consideration of the allegations with merit. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

> Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

*Jones v. Bock*, 549 U.S. 199, 203 (2007).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S.81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); see also *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory and non-discretionary. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir.2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596

F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. The Supreme Court has also recognized the need for a prisoner to face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its correctional facilities. Under this statutory authority, the Mississippi Department of Corrections has set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a complaint or grievance relating to any aspect of his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994). *See also Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549, at *1 (5th Cir. 2000). On September 19, 2010, the ARP process was changed from a three steps to two. *See Gates v. Barbour*, No. 4:71CV6-JAD, Doc. 1242 (N.D. Miss. Aug. 19, 2010); *Threadgill v. Moore*, No. 3:10CV378-TSL-MTP, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

The two-step ARP process begins when an inmate first submits his grievance in writing to the prison's legal claims adjudicator within thirty days of the incident. *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. 2013). The adjudicator screens the grievance and determines whether to accept it into the ARP process. *Id*. If accepted, the

grievance is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate. *Id.* If the inmate is unsatisfied with the first response, he may continue to the Second Step by completing an appropriate ARP form and sending it to the legal claims adjudicator. *Id.* The Superintendent, Warden or Community Corrections Director will then issue a final ruling, or Second Step Response – which completes the ARP process. *Id.* If the inmate is unsatisfied with that response, he may file suit in state or federal court. *Id.*

In this case, Mr. McCray never filed a grievance regarding lack of dental care, and he did not complete the grievance process regarding medical care for prostate trouble until *after* he filed the instant suit. McCray filed the instant suit on September 8, 2015, and he completed the grievance process regarding his prostate trouble on December 21, 2015, more than three months later. Thus, he did not even initiate, much less complete, the administrative remedy process as to his denial of dental care claim. Further, though he eventually completed the administrative remedy process as to his claim regarding treatment for prostate trouble, he did not do so *prior to* filing suit. Thus, Mr. McCray did not exhaust the grievance process as to either of his claims before filing suit, and this case must be dismissed for failure to exhaust administrative remedies.

**Denial of Medical Treatment**

In addition, even if Mr. McCray had exhausted the grievance process, his claims are without merit. In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate

indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id.* Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). In cases such as this, arising from delayed medical attention rather than a clear denial of medical attention, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay in order to state a claim for a civil rights violation. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Campbell v. McMillin*, 83 F. Supp. 2d 761 (S. D. Miss. 2000).

A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir.2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). "Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him

incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

Mr. McCray has not met that burden in the present case. To the contrary, he was examined and treated each time he filed a medical request form. Though there was a delay regarding provision of one of the drugs used to treat Mr. McCray's prostate pain, that delay arose because the medication prescribed was not included in the ordinary medicines the prison pharmacy dispensed. Once the medication was approved, Mr. McCray received it. Doctors and medical staff tried various treatments, and, when one proved ineffective, they tried another. Finally, when none of the less invasive treatments provided Mr. McCray relief, he was referred to a free world doctor for surgical intervention. Clearly, Mr. McCray has not shown that "[medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Instead, Mr. McCray received treatment on a regular basis culminating in surgery to correct his prostate trouble. Mr. McCray's dental treatment followed a similar pattern. As Mr. McCray was treated for his conditions on an ongoing basis, his claim for denial of adequate medical care must be dismissed.

## Conclusion

For the reasons set forth above, the motion by the defendants for summary judgment will be granted, and judgment will be entered for the defendants. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 13th day of June, 2017.

                                                **/s/ MICHAEL P. MILLS**
                                                **UNITED STATES DISTRICT JUDGE**
                                                **NORTHERN DISTRICT OF MISSISSIPPI**